**S.C. JOHNSON & SON, INC., Plaintiff,**

v.

**DOWBRANDS, INC., Dowbrands, L.P., and the Dow Chemical Company, Defendants.**

**No. CIV. A. 00–444–JJF.**

United States District Court, D. Delaware.

Aug. 17, 2001.

Allen M. Terrell, and Peter B. Ladig, Esquires, of Richards, Layton & Finger, Wilmington, DE, Of Counsel: Maurice J. McSweeney, Andrew J. Wronski and Cynthia J. Franecki, Esquires of Foley & Lardner, Milwaukee, Wisconsin, and James D. Dasso and Erin R. Lewis, Esquires, of Foley & Lardner, Chicago, IL, for Plaintiff.

Kenneth J. Nachbar, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Of Counsel: Herbert L. Zarov, Michele Odorizzi and Daniel J. Delaney, Esquires, of Mayer, Brown & Platt, Chicago, IL, for Defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is a Motion to Dismiss the Complaint (D.I. 8) filed by Defendants DowBrands, Inc., DowBrands, L.P. and The Dow Chemical Company ("Defendants"); a Motion for Partial Summary Judgment (D.I. 15) filed by Plaintiff S.C. Johnson & Son, Inc. ("Plaintiff"); and a Cross Motion for Summary Judgment (D.I. 26) filed by Defendants. For the reasons stated below, Plaintiff's Motion for Partial Summary Judgment (D.I. 15) on Count III will be granted; Defendants' Cross Motion for Summary Judgment (D.I. 26) on Counts I, IV, V and VI will be granted; and Defendants Motion to Dismiss and Motion for Summary Judgment on Count II will both be denied.

## BACKGROUND

### I. Nature and Stage of the Proceedings.

This case concerns alleged fraudulent misrepresentations and breaches of an Asset Purchase Agreement (the "Agreement") by and between S.C. Johnson & Son, Inc. ("SCJ"), DowBrands, Inc. and DowBrands, L.P. (referred to collectively as "DowBrands"). Under the Agreement, SCJ purchased certain assets and assumed certain liabilities relating to Dow-Brands' worldwide home food management products and home care products businesses (the "Business"). The transaction closed on January 23, 1998. At that time, DowBrands also delivered a "Closing Certificate" to SCJ, in which DowBrands reaffirmed that the representations and warranties in the Agreement were true and correct as of October 27, 1997, and as of the date of Closing (except for items that would not constitute a Material Adverse Change). Defendant Dow Chemical Company ("Dow") executed a guarantee of DowBrands' obligations to SCJ (the "Guarantee").

SCJ initiated this action on May 22, 2000, filing a six count Complaint (D.I. 1). The six counts are:

I. Breach of Contract Regarding Latin American Sales;

II. Fraudulent Misrepresentations Concerning Latin American Sales;

III. Breach of Contract Regarding Third Party Claims;

IV. Declaratory Judgment Relating to Intellectual Property;

V. Breach of Contract Concerning Absence of Contingent Liabilities and Material Adverse Change; and

VI. Breach of Closing Certificate.

These counts represent two general categories of claims: those relating to DowBrands' Latin American Business and those relating to SCJ's claims for indemnity with respect to certain patent infringement claims.

With respect to Latin America, SCJ alleges that shortly after Closing it discovered that DowBrands fraudulently misrepresented the extent of its Latin American business, and that DowBrands breached the representations and warranties in the Agreement concerning the Latin American business.

SCJ also alleges that DowBrands breached representations and warranties relating to certain intellectual property transferred pursuant to the Agreement, and improperly refused to indemnify SCJ and pay the costs SCJ has incurred in defending against a patent infringement claim brought by Tenneco Packaging and Specialty Consumer Products, Inc. ("Tenneco") several months after Closing.

SCJ's claims against Dow relate to Dow's failure to perform its obligations under the Guarantee.

Defendants responded to the Complaint on July 7, 2000, by filing a Motion to Dismiss (D.I. 8). SCJ responded to Defendants' Motion and moved for Partial Summary Judgment on Counts III and IV (D.I. 15) on August 31, 2000. Defendants then filed a Cross–Motion for Summary Judgment (D.I. 26) on all counts on October 20, 2000.

## II. Statement of Facts for Purposes of Defendants' Motion to Dismiss.

For purposes of the Defendants' Motion to Dismiss, the Court will review the allegations set forth in the Complaint. For many years, DowBrands has operated a successful business developing, manufacturing and selling a variety of home care products, such as specialty cleaners and laundry products, and home "food management products," including Zip–Loc ™ plastic storage bags. (Complaint, D.I. 1, at ¶ 8). In July 1997, Dow, which owns 100% of the stock in DowBrands, announced that it was auctioning off the business. *Id.* at ¶¶ 5, 9. As is customary, DowBrands hired an investment banker, prepared an Offering Memorandum, and collected information for prospective bidders in a dataroom. *Id.* at ¶ 9.

In the mid–1990's, DowBrands developed the technology to make zippered resealable plastic bags. *Id.* at ¶ 8. In September 1997, DowBrands began marketing those bags on a test basis under the name "Slide–Loc ™." *Id.* at ¶¶ 8, 38. According to SCJ, the patented Slide–Loc ™ technology was one of the most attractive aspects of DowBrands' business. *Id.* Included in the dataroom was an opinion from DowBrands' patent counsel explaining why, in counsel's opinion, DowBrands' newly-invented Slide–Loc ™ technology did not violate any patents held by Tenneco, which markets zippered plastic bags under the name "Hefty One Zip ™." *Id.* at ¶ 49. On October 27, 1997, SCJ and DowBrands entered into an Asset Purchase Agreement (D.I. 10, Exh. A), under which SCJ agreed to buy certain of DowBrands' assets and to assume certain of its liabilities for an initial purchase price, subject to later adjustments, of $1.125 billion. *Id.* at ¶ 13; Agreement § 2.03. The Agreement is to be construed under the laws of the State of Delaware according to Section 10.06 of the

Agreement. In Section 3.13, DowBrands represented and warranted that it owned and would transfer to SCJ all of the assets "whether tangible or intangible, real or personal, that are necessary for or used in the conduct of the Business as currently conducted by the Sellers." That same section "expressly disclaim[ed] any representation or warranty of any kind or nature, express or implied, as to the condition, value or quality of the Transferred Assets ... [e]xcept as expressly set forth in this Agreement" and provided that the sale of assets was on an "as is" basis. *Id.* In Section 2.02, SCJ agreed to assume all "Liabilities" of the Business, which were broadly defined in Section 1.01 to include "any liabilities or obligations of any nature, whether known or unknown, accrued, absolute, contingent or otherwise, and whether due or to become due."

In Section 3.15 of the Agreement, DowBrands made certain representations and warranties with respect to the intellectual property that was being transferred in the sale, including the intellectual property necessary to manufacture Slide–Loc™ bags. In Section 3.15(a), DowBrands represented and warranted that:

> [e]xcept as set forth on Schedule 2.01(a)(vii)(2) ..., (i) Sellers are the sole and exclusive owners of all rights to, or have a license that is in full force and effect to, the Transferred Intellectual Property, including the right to use such Transferred Intellectual Property to conduct the Business as currently conducted, without the payment of any license, fee, royalty or similar charge, and all such rights are fully assignable to Purchaser, and (ii) there is no claim by any Person or any Proceeding pending or, to the knowledge of Sellers, threatened which relates to the use of any of the Transferred Intellectual Property in the Business as currently conducted and as presently proposed to be conducted, or the validity or enforceability of the

Transferred Intellectual Property or the rights of the Sellers therein.

*Id.* Part 1 of Schedule 2.01(a)(vii)(2) disclosed a long list of existing licenses and third-party ownership interests to which the Transferred Intellectual Property was subject. (D.I. 10, Exh. B). Part 2 disclosed co-ownership interests in certain patents and patent applications. *Id.*

Part 3 of Schedule 2.01(a)(vii)(2) disclosed "Intellectual Property Claims Relating to Transferred Intellectual Property." Under that heading, DowBrands disclosed, among other things, that it was aware of a patent, U.S. Patent No. 5,131,121 (which is owned or licensed by Tenneco) which related to the "end stops" on the Slide–Loc™ bags. Although DowBrands stated its belief that its Slide–Loc™ bags did not infringe Patent No. 5,131,121, it agreed in Section 9.06 to share the burden of any costs resulting from a patent infringement action based on the end-stop design of the Slide–Loc™ bags, up to a maximum of $30 million. No similar arrangements were made with respect to the two other patent infringement claims that were disclosed on Schedule 2.02(a)(vii)(2).

In Section 3.15(b)(i) of the Agreement, DowBrands further represented and warranted that "[e]xcept as set forth on Schedule 2.01(a)(vii)(4) ..., to the knowledge of the Sellers no infringement of any intellectual property of any third party has occurred through conduct of the Business." The only exception noted on Schedule 2.01(a)(vii)(4) was the potential patent infringement claim with respect to the end-stops on the Slide–Loc™ bags. (D.I. 10, Exh. C). In Section 3.09 titled "Litigation," DowBrands represented and warranted that, except as set forth in Schedule 3.09(a) of the Disclosure Memorandum, "there is no Proceeding pending ... or, to the knowledge of Sellers, threatened, against or affecting the Business as cur-

rently conducted by Sellers or as proposed to be conducted or any of the Transferred Assets that could reasonably be expected to involve an amount in excess of $100,000 or which would individually or in the aggregate, have a Material Adverse Effect." The exceptions noted on Schedule 3.09(a) included not only a number of pending lawsuits, but also all of the claims arising out of the transferred intellectual property identified in Schedule 2.01(a)(vii)(2), including the potential end-stop patent infringement claim. (D.I. 10, Exh. D).

In Section 3.06 of the Asset Purchase Agreement, DowBrands represented and warranted that, since the date the last Balance Sheet was prepared, "the Business has been operated in the ordinary course in a manner consistent with past practice" and "there has not been any Material Adverse Change." The term "Material Adverse Change" was defined in Section 1.01 to mean a "material adverse change in the operations, assets ... or financial condition of the Business, taken as a whole."

The transaction closed on January 23, 1998. (D.I. 1, at ¶ 14). At closing, as required by the Agreement, DowBrands presented a Closing Certificate representing that all representations and warranties in the Agreement were true and correct not only when they were made, but also at the time of the Closing, with such exceptions as would not in the aggregate constitute a Material Adverse Change. *Id.*

DowBrands launched the sale of Slide–Loc bags on a nationwide basis in January 1998, just before the closing. *Id.* at ¶ 38. On May 1, 1998, Tenneco filed a suit for patent infringement against SCJ. *Id.* at ¶ 40. In that suit, Tenneco did not attack the end-stop design of the Slide–Loc bags, nor did it invoke the particular patent, No. 5,131,121, as to which SCJ and DowBrands had negotiated a special arrangement in Section 9.06 of the Agreement. Instead, Tenneco alleged that an entirely different patent, U.S. Patent No. 5,007,143, was infringed by the slider mechanism on the Slide–Loc bag. *Id.* at ¶ 41; *see also Tenneco Packaging Specialty and Consumer Products, Inc. v. S.C. Johnson & Son, Inc.,* 1999 WL 1044840, at *1, 1999 U.S. Dist. LEXIS 17937 at *2 (N.D.Ill. Nov. 12, 1999). SCJ contends that Tenneco had decided to sue for infringement of the slider patent "on or before the date the Agreement was executed and before the closing." (D.I. 1, ¶ 48). SCJ does not allege that any of the Defendants were aware of Tenneco's decision.

## A. Allegations Regarding the Patent Infringement Claim

SCJ offers a number of theories as to why the filing of the Tenneco patent infringement action supposedly constituted a breach of DowBrands' representations and warranties.

First, SCJ claims in Count IV that, if it loses the Tenneco patent infringement action, DowBrands would have breached the warranties and representations in Sections 3.13 and 3.15 of the Agreement. SCJ contends that under those circumstances, DowBrands would have breached the representation in Section 3.13 that "Sellers own good and valid title to all of the Transferred Assets ...." (D.I. 10, Exh. A, § 3.13(a)). Also, SCJ contends that DowBrands would have breached the representation in Section 3.15 that "Sellers are the sole and exclusive owners of all rights to, or have a license that is in full force and effect to, the Transferred Intellectual Property, including the right to use such Transferred Intellectual Property to conduct the Business as currently conducted ...." *Id.* at § 3.15. The Complaint does not specifically allege any knowledge by DowBrands of any patent infringement or of any existing or threatened patent in-

fringement claims or litigation that would constitute a breach of any of the representations and warranties in Sections 3.09, 3.15(a) or 3.15(b).

Second, SCJ contends that, regardless of the outcome of the Tenneco litigation, DowBrands breached its representation in Section 3.06 that there were no material Liabilities as of the closing date that were either undisclosed or not reserved for on its financial statements. SCJ also claims that Tenneco's alleged decision, prior to the closing, to sue for patent infringement constituted an undisclosed "Material Adverse Change." In Count V, SCJ seeks indemnification for these alleged breaches of contract. In Count VI, SCJ seeks damages for alleged inaccuracies in the closing certificate provided to it by DowBrands at closing.

Third, SCJ claims that Defendants' rejection of its demands for indemnification for reasonable attorneys' fees and expenses incurred in defending the Tenneco patent infringement action constituted a breach of contract under Section 9.03(b) of the Agreement.

SCJ seeks a declaratory judgment that Defendants will be responsible for any costs or losses it incurs as a result of the Tenneco litigation, as well as an order requiring Defendants to pay for all litigation costs SCJ incurs in the litigation.

### B. *Allegations Regarding the Latin American Business.*

DowBrands financial statements show that it had net sales on a world-wide basis in 1996 of $737,590,000. (D.I. 10, Exh. D, at 3). SCJ alleges that DowBrands represented in its Offering Memorandum that its exports to Latin America in 1996 totaled $19 million, or approximately 2.5% of its total net sales. (D.I. 1, ¶ 15). Although SCJ claims that DowBrands was deliberately inflating its Latin American sales in order to make the business look

more attractive to prospective buyers, it acknowledges that DowBrands disclosed that its 1997 Latin American exports were expected to drop to $15.2 million in 1997 and that, for the next three years sales were expected to remain in the $15–$17 million range. *Id.* at ¶¶ 17–18.

SCJ claims that it believed, based on these reported sales, that DowBrands had achieved consumer acceptance of its products in Latin America, or at least in the Latin American countries that were identified as having the most significant sales. SCJ alleges that it discovered, shortly after the closing, that in fact there was no market for DowBrands products in South America and that "in the past" 90% or more of the product sold to Latin American distributors had been diverted to the U.S. market instead.

A reading of the Complaint and Plaintiff's Answering Brief (D.I. 35) indicates that SCJ knew or had reason to know before the Closing that there had been some diversion of product from Latin America to the domestic market. The Complaint alleges that DowBrands' Commercial Director for Latin America, Jose Berdasco, "expressed concern about the possibility of diversion of sales intended for Latin America" in a meeting one week before Closing. (D.I. 1, ¶ 22). Mr. Berdasco produced a chart at that meeting titled "The 'D' Word." *Id.* at ¶ 23. That chart supposedly represented that DowBrands distributor, Consumer Products, Inc. ("CPI"), had been hired in response to the issue of diversion and that sales in the region had continued to grow. *Id.* SCJ claims that periodically after the Asset Purchase Agreement was signed, it was given additional data indicating the existence of substantial exports to Latin America and was repeatedly assured by DowBrands' representatives that the reported exports were legitimate. *Id.* at

¶ 24. Also, Plaintiff indicates in its Answering Brief that additional investigation conducted after the filing of the Complaint revealed that the Euromonitor report was available in the data room. (D.I. 35, at 35 n. 18).

SCJ asserts that it has been forced to make a significant, unanticipated investment in the Latin American business in order to build it "from nothing to the level it would have been had the Latin American exports existed as represented by DowBrands." *Id.* at ¶ 36. SCJ seeks damages in the amount of $20 million under two theories, breach of contract (Count I) and fraud (Count II). In its breach of contract claim, SCJ alleges that DowBrands breached it representation that the financial statements attached to the Asset Purchase Agreement "fairly present, in all material respects, the financial condition and results of operation of the Combined Business." *Id.* SCJ also claims that the financial statements were inaccurate because they listed various South American countries as countries that had "the most significant" foreign sales, when, according to SCJ, the sales to those countries were being diverted in significant part to the United States.

SCJ's other breach of contract theory is that DowBrands breached its representation in Section 3.08(b) that the business "has been operating in the ordinary course in a manner consistent with past practice" because "[s]elling product destined for Latin America knowing the product would be substantially diverted to the United States does not constitute operating the business in the ordinary course." *Id.* at ¶ 61.

In Count II of the Complaint, SCJ also alleges that various oral and written statements by DowBrands allegedly made to it in the Agreement and in presentations and discussions concerning sales to Latin America constituted fraud. SCJ alleges that the statements were material and that it reasonably relied on DowBrands' assurances that the sales figures for the Latin American business were substantially correct.

### III. Plaintiff's Statement of Additional Facts in Support of its Motion for Partial Summary Judgment on Counts III and IV.

In support of its Motion for Partial Summary Judgment (D.I. 15), SCJ offers the following evidence.

On or about October 27, 1997, SCJ and Defendants signed the Agreement for the purchase and sale of certain properties, assets, rights, claims and contracts relating to DowBrands' home food management and home care products business including DowBrands' Slide–Loc ™ resealable plastic bag products. (D.I. 17, Exh. 1, ¶ 4). At the same time, Dow executed the Guarantee, guaranteeing DowBrands' performance under the Agreement. *Id.* at ¶ 3. On January 23, 1998, the transaction contemplated by the Agreement closed. *Id.* at ¶ 4.

In September, 1997, DowBrands began test marketing a recently developed resealable plastic storage bag under the brand name Slide–Loc ™, and formulated plans for a national "roll-out" of the Slide–Loc ™ product in January, 1998. *Id.* at ¶ 5.

On May 1, 1998, Tenneco filed a Complaint for injunctive relief and damages in the United States District Court for the Northern District of Illinois ("Tenneco Complaint"). *Id.* at Exh. 5. The Tenneco Complaint alleges that the manufacture, use and sale of the Slide–Loc ™ reclosable plastic bags infringes on U.S. Patent No. 5,007,143. *Id.* at Exh. 5, ¶¶ 12–13. As part of its Complaint, Tenneco seeks an injunction against SCJ. *Id.* at Exh. 5, p. 4.

In the Agreement, DowBrands represented and warranted that it was transferring to SCJ all the intellectual property necessary for or used in its Business, that the transferred intellectual property would be available to SCJ, and that SCJ would have all rights to the transferred property, including the right to use the transferred intellectual property without the payment of any additional, undisclosed fee. (D.I. 17, Exh. 2, §§ 3.13, 3.15). In the Agreement, DowBrands also promised to pay fees and expenses of counsel incurred by SCJ in defending against a Third Party Claim seeking an injunction. *Id.* at § 9.03(b). Dow guaranteed all of these obligations. (D.I. 17, Exh. 3).

Transferred Intellectual Property is defined in the Agreement to include, among other things:

> (ii) all concepts, inventions, trade secrets, confidential or proprietary information, . . . drawings, specifications, designs, plans, proposals and technical data and manuals, whether patentable or unpatentable, owned by Sellers and used in the Business, as currently conducted or as proposed to be conducted, including those related to products developed or studied or under development or study . . . .

(D.I. 17, Exh. 2, § 1.01).

In a letter dated June 30, 1998, SCJ notified DowBrands in writing that it was claiming indemnity from DowBrands for any adverse judgment or settlement of the Tenneco Litigation and for SCJ's fees and expenses of counsel in defending the Tenneco Litigation. (D.I. 17, Exh. 1, ¶ 6). A copy of this letter was also sent to Dow. *Id.* Shortly thereafter, in a letter dated July 15, 1998, DowBrands rejected SCJ's claim for indemnity and stated that it would not pay any of SCJ's legal expenses or Damages relating to the Tenneco Complaint. *Id.;* Exh. 7.

## IV. Defendants' Statement of Additional Facts in Support of their Cross–Motion for Summary Judgment on all Counts.

In support of their Cross Motion for Summary Judgment, Defendants offer evidence to demonstrate that the lack of market penetration in Latin America was disclosed to SCJ. Defendants cite SCJ's allegation in the Complaint that DowBrands knew it had not succeeded in selling its products in Latin America because they were aware of a January 1997 memorandum from Euromonitor stating that "no Dow products were identified in any of the sites visited in Brazil, Chile or Argentina." (D.I. 1, ¶ 29).

According to the Affidavit of William Wales, who was general counsel of DowBrands and was responsible for managing the data room for potential bidders for DowBrands' assets, SCJ was aware or at a minimum, should have been aware of the Euromonitor document, and therefore, Defendants did not fraudulently conceal the information. (D.I. 28, ¶¶ 1, 13). As part of the auction process for DowBrands' assets, a data room was established containing numerous documents available for the review of potential bidders, including SCJ. Separate data rooms were maintained in Indianapolis, Indiana and at Mayer, Brown & Platt's office in Chicago, Illinois. On September 9, 1997, copies of the Euromonitor document entitled "Latin America Market Analysis Project" that SCJ quotes in the Complaint, were put in each data room. *Id.* at ¶ 13. This document was indexed in the data room as document "I.2.6" and designated "NC," which meant that the document was available for potential bidders to review and take notes from, but could not be copied due to its commercial value to DowBrands. SCJ, and all other potential bidders, were advised well before they submitted their bids that this

document was available in the data room for their review. *Id.*

## STANDARDS OF REVIEW

### I. Motion to Dismiss

Pursuant to Rule 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). Thus, when considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. *See Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994). However, the court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost,* 1 F.3d at 183 (citation omitted). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Defendants contend that Counts I and II can and should be resolved as a matter of law, based on their motion to dismiss. (D.I. 95, at 17).

### II. Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted if the Court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, " 'courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties.' "

*Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981) (citations omitted). Furthermore, any reasonable inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Spain v. Gallegos,* 26 F.3d 439, 446 (3d Cir.1994) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1230 (3d Cir.1993)).

In this case, Plaintiff and Defendants agree in the Joint Pretrial Report and Order (D.I. 95) and represented to the Court on July 26, 2001 in a status conference regarding the present applications that Counts III, IV, V and VI can and should be resolved as a matter of law, based on the pending cross-motions for summary judgment. (D.I. 95, at 18–20; Transcript, at D.I. 97).

## DISCUSSION

### I. Count IV—Declaratory Judgment Relating to Intellectual Property

In Count IV of the Complaint, "SCJ seeks a declaration that if as a result of the Tenneco Litigation, it is enjoined from making and selling Slide–Loc ™ bags or is compelled to satisfy an adverse judgment or settle claims in the Tenneco Litigation" Dowbrands will have breached Sections 3.13 and 3.15 of the Asset Purchase Agreement. (D.I. 1, ¶¶ 78, 80). Defendants contend that SCJ's claim for declaratory relief is premature.

■ The Declaratory Judgment Act provides, in relevant part, that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Under Article III of the Unit-

ed States Constitution, the presence of a "case or controversy" is a condition precedent to the exercise of jurisdiction under this Act. *See Travelers Ins. Co. v. Obusek,* 72 F.3d 1148, 1153 (3d Cir.1995).

■ Federal jurisdiction over claims under the Declaratory Judgment Act is also restricted by the doctrine of ripeness. Article III of the Constitution prohibits federal courts from issuing advisory opinions. *See Hurley v. Columbia Cas. Co.,* 976 F.Supp. 268, 272 (D.Del.1997). Thus, if a case is not ripe, a federal court lacks subject matter jurisdiction to adjudicate the claim. *Id.* Determining ripeness of a claim for declaratory relief, in which a court may properly render judgment "before an 'accomplished' injury has been suffered," is particularly difficult. *Step–Saver Data Systems, Inc. v. Wyse Tech.,* 912 F.2d 643, 647 (3d Cir.1990). Generally, a court should focus on the timing of the plaintiff's claim in order "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Armstrong World Indus., Inc. v. Adams,* 961 F.2d 405, 411 (3d Cir.1992). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Step–Saver,* 912 F.2d at 647 (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).

In addition, the United States Supreme Court has "repeatedly characterized the Declaratory Judgment Act as 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" *Wilton v. Seven Falls Co.,* 515 U.S. 277, 287, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). In the declaratory judgment context, "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* Emphasizing the "unique breadth of this discretion," the Supreme Court stated that it is "more consistent with the statute to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Id.* at 289, 115 S.Ct. 2137.

In support of their argument, Defendants rely upon the Court of Appeals for the Third Circuit's decision in *Step–Saver.* In *Step–Saver,* the Third Circuit affirmed the dismissal of a claim for indemnity on ripeness grounds. *Step–Saver,* 912 F.2d at 645. In its opinion, the Third Circuit focused on plaintiff's use of the word "if" in the complaint, noting that plaintiff had not accused defendant of providing defective components, but rather had alleged that *if* another court found that the components were defective, then defendant would be liable for any damages. *Id.* at 647. The Third Circuit held that plaintiff's lawsuit asked for a contingent declaration of the parties' rights, and therefore, it constituted an impermissible request for an advisory opinion. *Id.* at 649.

■ Here, Tenneco has engaged SCJ in a patent infringement lawsuit, but that act alone is insufficient to compel the Court to issue a declaratory judgment at this time. Until the infringement is established, and the Tenneco court announces the bases of its decision, it is difficult for the Court to make a declaration of rights in this case, and determine what remedies, if any, are implicated. In fact, all parties involved in the instant case agree with the position that the Slide–Loc ™ bags do not infringe Tenneco's patent. If SCJ ultimately prevails in the underlying Tenneco litigation,

the instant issue would not be disputed under the Agreement. Further, and as discussed below in Section II of the Court's Discussion, SCJ is protected in the meantime by the remedy set forth in Section 9 of the Agreement providing for indemnification of attorneys' fees and expenses incurred in the defense of the Tenneco Litigation. For these reasons, the Court concludes that this issue is not sufficiently ripe to present a "case" or "controversy" and that, if it were, the Court would still, in the exercise of its discretion, decline to provide declaratory relief.

## II. Count III—Breach of Contract Regarding Third Party Claims

■ In Count III of the Complaint, SCJ seeks indemnification for the attorney's fees and expenses it has incurred to date in defending Tenneco's patent infringement action.

In construing the plain language of the Agreement, the Court concludes that the Tenneco Litigation presents a "Third Party Claim," as defined in Section 9.03 of the Agreement. Consistent with Section 9.03(a), the Tenneco Litigation involves a claim, by a person other than a party to the Agreement, "which could give rise to Damages for which an Indemnifying Party could be liable to an Indemnified Party." (D.I. 10, Exh. A, § 9.03(a)). The Court notes that the definition of Third Party Claim does not depend upon the ultimate outcome of the underlying litigation. Instead, it depends upon the *possibility* of recovery under the Agreement's indemnification provisions.

■ The Agreement generally allows Defendants (when they are the "Indemnifying Parties") to control the defense of Third Party Claims and hire their own

attorneys at their expense. *Id.* at § 9.03(b).[1] There are several circumstances, however, where Plaintiff, as the "Indemnified Party," is entitled to assume control of the defense of a claim. Relevant to the Court's inquiry here, DowBrands is not entitled to "assume control of the defense of a Third Party Claim and shall pay the reasonable fees and expenses of counsel retained by the Indemnified Party (provided that such counsel is reasonably acceptable to the Indemnifying Party) if . . . (iii) the claim seeks an injunction or equitable relief against the Indemnified Party." *Id.* Thus, under the "carve-out" provision of Section 9.03, Defendants are obligated to pay the defense costs, provided other requirements, such as notice and reasonable consent, are met. *Id.*

The Tenneco Litigation seeks an injunction. (D.I. 17, Exh. 5). Pursuant to the Agreement, SCJ sent a letter to Dow-Brands and Dow requesting that Dow-Brands pay for the attorneys' fees and expenses. *Id.* at Exh. 6. DowBrands refused to pay. *Id.* at Exh. 7. The Court concludes that DowBrands' refusal to pay the attorneys' fees and expenses breached Section 9.03 of the Agreement, and Dow is also liable for this breach under its Guarantee. *Id.* at Exh. 3.

■ Defendants contend that SCJ's claim for attorneys' fees and expenses may not be ripe unless SCJ's Damages, including attorneys' fees, exceed $10 million in the aggregate. Defendants point to Section 9.04 which provides that "no claim for indemnification *under Section 9.01(a) or, with respect to a breach of Section 5.01 only, Section 9.01(b)* . . . may be made, and no payment in respect thereof shall be required" unless the total amount of Dam-

---

1. Section 9.03(b) provides: "[I]n the event of a Third Party Claim, the Indemnifying Party shall be entitled to control the defense of such Third Party Claim and to appoint counsel of the Indemnifying Party's choice at the expense of the Indemnifying Party to represent the Indemnified Party . . . ."

ages exceeds $10 million. (D.I. 10, Exh. A, § 9.04 (emphasis added)). Thus, the Section 9.04 "basket" applies to claims under 9.01(a) and to a narrow class of claims under 9.01(b). .

In this case, the Court is persuaded that SCJ's claim for attorneys' fees and expenses incurred in the Tenneco Litigation does not arise under Section 9.01(a) or Section 5.01. Instead, Defendants' breach of Section 9.03 of the Agreement gives SCJ a claim for indemnification, under Section 9.01(b), for "any breach of any covenant or agreement . . . of Sellers contained in this Agreement." According to the plain language of Section 9.04, that claim is not subject to the "basket."

Therefore, as discussed above, the Court concludes that Plaintiff is entitled to summary judgment on Count III of the Complaint.[2]

### III. Counts V and VI—Breach of Contract Regarding Absence of Contingent Liabilities and Material Adverse Change and Breach of Closing Certificate.

In Counts V and VI of the Complaint, SCJ alleges that the filing of the Tenneco Litigation constitutes a breach of Sections 3.06 and 3.08 of the Agreement, and a breach of the closing certificate.

#### A. *Section 3.08*

█ In Section 3.08, DowBrands represented and warranted that there had been no "Material Adverse Change" in its business between June 30, 1997 (the date of the last Balance Sheet provided to SCJ) and the date of the Agreement, October 27, 1997. Material Adverse Change is defined in the Agreement to mean a "material adverse change in the operations, assets

. . . or financial condition of the Business, taken as a whole." (D.I. 10, Exh. A, at § 1.01). SCJ contends that "Tenneco's undisclosed internal decision to file a patent infringement action with respect to the slider mechanism constituted a Material Adverse Change."

The Court construes the term "Material Adverse Change" in the context of the Sellers' own operations, assets or financial condition. The sole decision by a third party to bring a lawsuit does not bring about any change in the company's assets, unless and until a court adjudicates the claim in favor of the third party and decides that the asset can no longer be used in the business. In the Tenneco Litigation, a final judgment in Tenneco's favor still has not occurred to date and may, in fact, never occur. Thus, the Court concludes that there is no basis for SCJ's claim that DowBrands breached its representation and warranty that there had been no Material Adverse Change prior to Closing.

#### B. *Section 3.06*

SCJ also contends that DowBrands breached its representation in Section 3.06(c) of the Agreement that there were no "Liabilities" as of October 27, 1997. "Liability" is a defined term that "means any liabilities or obligations of any nature, whether known or unknown, accrued, absolute, contingent, or otherwise, and whether due or to become due." (D.I. 10, Exh. A, at § 1.01). SCJ argues that Tenneco's decision to sue for patent infringement, the potential of which may have been known by Dow even though the lawsuit had not yet been filed by Tenneco, constituted a Liability that was not re-

---

**2.** In addressing what may be characterized as a question of "semantics" raised in the briefing, the Court clarifies that it is not entering a declaratory judgment on Count III. Instead, the Court is concluding that Defendants are entitled, as a matter of law, to reimbursement of attorneys' fees and expenses incurred in defending the Tenneco Litigation.

flected on the Balance Sheet. The record reflects that although DowBrands stated its belief that its Slide–Loc ™ bags did not infringe U.S. Patent No. 5,131,121, Dow-Brands agreed in Section 9.06 to share the burden of any costs resulting from a patent infringement action based on the "end stop" design of the Slide–Loc ™ bags, up to a maximum of $30 million. However, it appears from the record that neither party fairly anticipated Tenneco's lawsuit claiming infringement by a different patent, U.S. Patent No. 5,007,143, based on the slider mechanism on the Slide–Loc ™ bags.

Defendants contend that Section 3.06(c) should be interpreted in the context of Section 3.06 as a whole. According to Defendants, Section 3.06 warranted and represented that the financial statements provided to SCJ and attached to the Agreement fairly presented, in all material respects, its financial condition and results of operations. As part of that overall representation, DowBrands represented that it had not incurred any Liabilities as of the date of the Agreement that were not already disclosed in the Disclosure Memorandum (including the notes set forth in the audited Financial Statements), and that were not already reflected or reserved against in the Balance Sheet.

■ On this record, the Court concludes that DowBrands represented in Section 3.06(c) that there were no material Liabilities between the date of the Balance Sheet and the date the Agreement was signed. In the Court's view, this representation does not set forth a guarantee that there would be no claims asserted in the future that could possibly jeopardize future anticipated revenues and profits. Because the Court finds that the Tenneco Litigation was disclosed to the extent it was known by DowBrands at the time, and the Tenneco Litigation was not contemplated as part of the Balance Sheet in the context of future anticipated revenues and profits, the Court concludes that the Tenneco Litigation does not constitute a basis for SCJ's claim that DowBrands breached Section 3.06(c) of the Agreement.

### C. Closing Certificate

■ In Count VI of the Complaint, SCJ alleges that Defendants breached the representations and warranties in the Closing Certificate to the effect that DowBrands' representations and warranties in the Agreement were true and correct (except for items which in the aggregate would not constitute a Material Adverse Change) as of October 27, 1997 and as of the date of Closing, January 28, 1998. For reasons previously discussed above with respect to Sections 3.08 and 3.06, and because Tenneco did not file its patent infringement action with respect to the slider mechanism until May 1, 1998, the Court concludes that the Tenneco Litigation does not constitute a basis for SCJ's claim in Count VI that DowBrands breached the Closing Certificate.

In sum, because the Court concludes that Counts V and VI of the Complaint fail as a matter of law, Defendants' Cross Motion for Summary Judgment regarding Counts V and VI will be granted.

## IV. SCJ's Latin American Claims

### A. Count I—Breach of Contract Regarding Latin American Sales

In Count I of the Complaint, SCJ claims that the alleged unknown diversion of products intended for sale in Latin America by DowBrands' distributors amounts to a breach of the representations and warranties in Sections 3.06 and 3.08 of the agreement.

#### 1. Section 3.06

DowBrands represented in Section 3.06 that the 1996 financial statements "fairly

present, in all material respects, the financial condition and results of operations of the Combined Business." SCJ contends that the 1996 financial statements were materially misstated because some unidentified portion of the $19 million in Latin American sales, which totaled 2.5% of DowBrands' worldwide sales of $737,590,000, should have been classified as U.S. sales based on the alleged diversion by DowBrands' Latin American distributors of products intended for sale in Latin America.[3] SCJ also contends that the Financial Statements were inaccurate because they listed several Latin American countries as being among the "foreign countries with the most significant sales."

 To prevail on its claim under Section 3.06, SCJ must be able to demonstrate that there was a material discrepancy that caused the Financial Statements to be an unfair and materially inaccurate presentation of the financial condition and results of the combined operation of the Business. The Court concludes that, as a matter of law, SCJ cannot meet that burden. The Latin American sales reported by Dow-Brands were only 2.5% of DowBrands' total assets. SCJ claims that some "significant" portion of those sales were diverted to the U.S. market, but SCJ does not specify the alleged percentage of those sales that were diverted. That percentage would reduce the alleged discrepancy even further. Nonetheless, the Court concludes that, in the context of a billion dollar transaction, the misclassification of less than 2.5% of total sales as foreign, rather than domestic, does not materially turn the Financial Statements into an unfair presen-

tation of the Combined Business' financial condition and results of operations. In reaching this conclusion, the Court finds it important that SCJ does not allege that the total sales reported by DowBrands were inaccurate.

 In addition, the Court concludes that SCJ cannot state a claim based on the statement that several Latin American countries were among the "foreign countries with the most significant sales." The Court does not construe that provision as a representation or warranty that any particular level of sales had been achieved in the countries listed. Thus, even if SCJ were able to prove a "significant" diversion of a relatively small amount of sales, it would not constitute a breach of that provision.

## 2. Section 3.08

 The Sellers represented in Section 3.08 that "since the date of the Balance Sheet [June 30, 1997] . . . the Business has been operated in the ordinary course in a manner consistent with past practice . . . ." SCJ alleges that this representation was breached because the alleged diversion of products was not "in the ordinary course." The Complaint, however, asserts that such diversion had been occurring since at least 1996. SCJ concedes that it has no claim that diversion was not consistent with past practice, but contends that Section 3.08 was still breached because diversion does not constitute operating the Business in the ordinary course. The Court does not agree with SCJ's interpretation because it does not account for the fact that the term

---

3. The Financial Statements included a breakdown between foreign and domestic sales described in a note on "Segment Information" (D.I. 10, Exh. D, at 12). The Segment Information note reported total domestic sales of $654 million in 1996, and total foreign sales of $84 million in 1996. Neither that note nor anything else in the Financial Statements re-

ported what portion of the $84 million was attributable to Latin American sales. SCJ alleges that the Offering Memorandum reported $19 million in Latin American sales in 1996 (D.I. 1, ¶ 15), but that is not a figure that appears in the Financial Statements or that was confirmed by any representation in the Asset Purchase Agreement.

■■■■ course" is explicitly modified by the phrase "in a manner consistent with past practice." Thus, a breach would occur only if the business was not operated in "the ordinary course *in a manner consistent with past practice.*" (D.I. 10, Exh. A, § 3.08 (emphasis added)). This provision is not written in the disjunctive. The Court concludes that SCJ's concession that diversion was not inconsistent with past practice precludes its claim that diversion after June 30, 1997 amounts to a breach of Section 3.08.

In sum, the Court concludes that Count I of the Complaint fails to state a claim upon which relief could be granted, and therefore, Defendants' Motion to Dismiss Count I will be granted.

**B.** *Count II—Fraudulent Misrepresentation Regarding Latin American Sales*

■■ In support of its Motion to Dismiss Count II of the Complaint, Defendants argue that SCJ's fraud claim, based on alleged representations that do not appear in the Agreement, is barred by Section 10.10 of the Agreement. Section 10.10 provides:

10.10. *Entire Agreement.* This Agreement (including the documents and instruments referred to in this Agreement) sets forth the entire understanding and agreement between the parties as to the matters covered in this Agreement and supersedes and replaces any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect to such understanding, agreement or statement. Purchaser acknowledges that it has conducted it own independent review and analysis of the Business and the Transferred Assets and that it has been provided access to the properties, records and personnel of Sellers for this purpose. In entering into this Agreement, Purchaser has relied solely upon its own investigation and analysis and the representations and warranties set forth in the Agreement and acknowledges that (a) none of Sellers or any of their respective Affiliates, directors, officers, employees, agents, representatives or advisors makes any representation or warranty, either express or implied, as to the accuracy or completeness of (and agrees that none of such persons shall have any liability or responsibility to it in respect of) any of the information, including without limitation any projections, estimates or budgets, provided or made available to Purchaser or its agents or representatives, except as and only to the extent expressly provided for in this Agreement. Nothing in this Section 10.10 is intended to preclude any remedy for fraud or limit any right of Purchaser with respect to any breach of or inaccuracy in any representation or warranty in this Agreement.

(D.I. 10, Exh. A, § 10.10).

The Court construes the last sentence of Section 10.10 as two independent clauses that must each be given effect. The first clause preserves the right to sue for fraud: "Nothing in this Section 10.10 is intended to preclude any remedy for fraud ...." The second clause confirms the right to sue for misrepresentations in the agreement: "Nothing in this Section 10.10 is intended ... to limit any right of Purchaser with respect to any breach of or inaccuracy in any representation or warranty in this Agreement."

Defendants contend that this interpretation would render the other provisions of Section 10.10 "utterly meaningless." (D.I. 27, at 29). The Court disagrees and finds that its construction of Section 10.10 operates to bar a wide array of claims based on representations or statements not con-

tained within the Agreement, such as those for breach of contract, promissory estoppel and negligent misrepresentation. In contrast, the Court concludes the parties agreed not to preclude fraud claims under any circumstances.

Further, under Delaware law, merger and disclaimer clauses do not prevent claims of fraudulent misrepresentation.[4] Delaware courts have consistently held that an integration clause in a contract does not bar a fraud claim brought by a party to that agreement. *See Bergen v. Anglin*, No. Civ. A. 82–C–SE–20, 1988 WL 25859, at *3 (Del. March 15, 1998) (holding that "as is" clause in contract doe not preclude claim based on fraudulent misrepresentation); *Norton v. Poplos*, 443 A.2d 1, 6 (Del.1982) (stating the "clear" legal standard that an integration clause does not preclude a claim based upon fraudulent misrepresentations); *In re Kirkwood Kin Corp. v. Dunkin Donuts, Inc.*, No. Civ. A. 94C–03–189–WTQ, 1997 WL 529587, at *12 (Del.Super.Jan.29, 1997) (holding that the existence of an integration clause in parties' agreement does not bar plaintiff's fraud claim based on representations made prior to signing the agreement). In fact, the one case cited by Defendants that does rely on Delaware law is consistent with Plaintiff's position. In *DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F.Supp. 1132 (D.Del.1996), the court recognized that an "as is" clause in a sales contract will not insulate a seller from suit for its fraudulent misrepresentation.

SCJ further alleges in the Complaint that DowBrands knew about, but failed to disclose, a study performed by an entity called Euromonitor showing that its Latin American distributors were diverting significant amounts of DowBrands' products intended for sale in Latin America. (D.I. 1, ¶ 29).

In support of its Motion for Summary Judgment, Defendants offer evidence that the allegedly undisclosed "Euromonitor Study" cited in the Complaint was placed in DowBrands' data room and available to SCJ. (D.I. 28, ¶ 13). SCJ notes that the Complaint contains six full pages, in 23 separate paragraphs, of background allegations that specifically detail DowBrands' representations about its Latin American sales. (D.I. ¶¶ 15–36, 66–72). Defendants' Motion for Summary Judgment, however, only addresses the single allegation regarding the concealment of the Euromonitor Study, and does not address the additional allegations. In this instance, the fact that the Euromonitor Study was disclosed and allegedly known to SCJ by virtue of its placement in the data room, negates any allegation of fraudulent conduct by Defendants with respect to this information.

Under Delaware law, a party asserting a claim of fraudulent misrepresentation must demonstrate that: (1) the defendant made a substantial, material misrepresentation respecting the transaction; (2) the representation must be false; (3) the defendant must have known the representation was false when he made it; (4) the defendant made the representation with the intention of inducing the plaintiffs to act upon it; and (5) the plaintiff acted in reliance on the statement and was harmed as a result. *Lock v. Schreppler*, 426 A.2d 856, 861 (Del.Super.1981). Defendants' Cross Motion for Summary Judgment addresses only the disclosure of the Euromonitor Study. However, SCJ asserts other facts, beyond the information disclosed in that Study,

---

**4.** Section 10.06 provides that the "Agreement shall be governed by and construed in accordance with the laws of the State of Delaware."

concerning DowBrands' representations regarding the Latin American sales. SCJ may be able to demonstrate that these additional allegations are "material" and meet the other criteria under Delaware law as set forth in *Lock.* Although the disclosure of the Euromonitor Study provides Defendants some protection against SCJ's claims of fraud, the Court is not convinced at this juncture that it can grant summary judgment because of the additional allegations asserted by Plaintiff.[5] In this regard, the Court is mindful that Delaware state courts view fraud cases under Delaware law as "fact-specific," and where a party asserts several factual bases for the fraud, the Court must permit an opportunity for the parties to examine those facts. *See Fort Howard Cup Corp. v. Quality Kitchen Corp.,* No. Civ. A. 89C–DE–34, 1992 WL 207276, at * 3 (Del.Super.Aug.17, 1992). Thus, the Court concludes that genuine issues of material fact exist with respect to Count II, and therefore, Defendants' Motion for Summary Judgment on Count II will be denied.

### CONCLUSION

For the reasons discussed, the Court concludes that Defendants' Motion for Summary Judgment (D.I. 26) will be granted with respect to Counts I, IV, V and VI. Plaintiff's Motion for Partial Summary Judgment (D.I. 15) will be granted with respect to Count III. Defendants' Motion to Dismiss and Motion for Summary Judgment on Count II will be denied.

An appropriate Order will be entered.

### *ORDER*

WHEREAS, presently before the Court is a Motion to Dismiss the Complaint (D.I. 8) filed by Defendants DowBrands, Inc.,

DowBrands, L.P. and The Dow Chemical Company ("Defendants"); a Motion for Partial Summary Judgment (D.I. 15) filed by Plaintiff S.C. Johnson & Son, Inc. ("Plaintiff"); and a Cross Motion for Summary Judgment (D.I. 26) filed by Defendants;

NOW THEREFORE, for the reasons set forth in the memorandum opinion issued this date, IT IS HEREBY ORDERED this 17th day of August 2001 that:

1. Defendants' Motion to Dismiss (D.I. 8) is *DENIED*.

2. Plaintiff's Motion for Partial Summary Judgment (D.I. 15) is *GRANTED* with respect to Count III of the Complaint, and denied in all other respects.

3. Defendants' Cross Motion for Summary Judgment (D.I. 26) is *GRANTED* with respect to Counts I, IV, V and VI of the Complaint, and *DENIED* with respect to Counts II and III of the Complaint.

---

**5.** Plaintiff's Answering Brief (D.I. 35, at 35–36) sets forth a recitation of allegations supporting its fraudulent misrepresentation claim, and the Court agrees with SCJ that other allegations of fraud exist other than those based on the Euromonitor Study.