

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2003

# AES Corp v. Dow Chem Co

Precedential or Non-Precedential: Precedential

Docket 01-3373

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"AES Corp v. Dow Chem Co" (2003). *2003 Decisions.* Paper 591.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/591

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3373

AES CORP.,
 Appellant

v.

THE DOW CHEMICAL COMPANY;
DYNEGY POWER CORPORATION
f/k/a Destec Energy Inc.

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civil Action No. 99-cv-00673)
District Judge: Honorable Joseph J. Farnan, Jr.

Argued May 23, 2002

Before: MCKEE, STAPLETON and WALLACE,*
*Circuit Judges*

(Filed: April 14, 2003)

---

* Honorable J. Clifford Wallace, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Dennis E. Glazer
James W.B. Benkard (Argued)
Frances E. Bivens
Davis, Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
 and
Michael D. Goldman
Stephen C. Norman
Potter, Anderson & Corroon
1313 North Market Street
6th Floor - P.O. Box 951
Wilmington, DE 19899
 Attorneys for Appellant

Herbert L. Zarov
Michele L. Odorizzi (Argued)
Daniel J. Delaney
Mayer, Brown, Rowe & Maw
190 South LaSalle Street
Chicago, IL 60603
 and
David C. McBride
John W. Shaw
Young, Conaway, Stargatt & Taylor
P.O. Box 391
1000 West Street
Brandywine Building - 17th Floor
Wilmington, DE 19899
 Attorneys for Appellee

## OPINION OF THE COURT

STAPLETON, *Circuit Judge*:

### I. *Introduction*

The AES Corporation ("AES") operates power facilities. AES alleges that Dow Chemical Company ("Dow") and its subsidiary, Destec Energy, Inc. ("Destec"),[1] violated Sections

---

1. Destec has since changed its name to Dynegy Power Corporation.

10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with a transaction in which AES purchased the stock of one of Destec's subsidiaries, Destec Engineering, Inc. ("DEI"). DEI's sole asset was a contract to design and construct a power plant in The Netherlands (the "Elsta Plant"). According to AES, Dow and Destec conspired to sell DEI at an artificially inflated price by making misrepresentations material to an evaluation of DEI.

During the pendency of this case in the District Court, AES and Destec entered into a settlement agreement. Thus, only the claims against Dow remain. There has been no discovery. Dow moved for summary judgment, relying solely on documents relating to the transactions in which AES acquired DEI's stock. In response, AES filed a Rule 56(f) affidavit requesting discovery in identified areas. The District Court nevertheless granted Dow's summary judgment motion. The District Court held that certain clauses in the transaction documents rendered AES's reliance on the alleged misrepresentations unreasonable as a matter of law.

## II. *Background*

Dow formed Destec to build and run power plants that would supply power to Dow Chemical facilities and third-party users. In 1996, after determining that it could not profitably run Destec as its subsidiary, Dow retained Morgan Stanley to perform a valuation of Destec in order to initiate a public sale.

Morgan Stanley issued a Confidential Offering Memorandum on behalf of Destec. As a precondition to receiving the Offering Memorandum, AES signed a Confidentiality Agreement that provided in part:

> We [AES] acknowledge that neither you [Destec], nor Morgan Stanley [Destec's Investment Banker] or its affiliates, nor your other Representatives, nor any of your or their respective officers, directors, employees, agents or controlling persons within the meaning of section 20 of the Securities Exchange Act of 1934, as amended, make any express or implied representation

> or warranty as to the accuracy or completeness of the Information, and we agree that no such person will have any liability relating to the Information or for any errors therein or omissions therefrom. We further agree that we are not entitled to rely on the accuracy or completeness of the Information and that we will be entitled to rely solely on any representations and warranties as may be made to us in any definitive agreement with respect to the Transaction, subject to such limitations and restrictions as may be contained therein.

App. at 197, ¶ 5. Dow was not a party to the Confidentiality Agreement but is alleged to have been a "controlling person" of Destec within the meaning of § 20(a) of the Exchange Act.

The Offering Memorandum included projections and estimates about the future performance of Destec's businesses, including DEI and the Elsta Plant. Like the Confidentiality Agreement, the Offering Memorandum warned readers that they were not to rely on the accuracy or completeness of information contained therein. It further stated:

> [o]nly those particular representations and warranties which may be made to a purchaser in a definitive agreement, when, as, and if executed, and subject to such limitations and restrictions as may be specified in such definitive agreement, shall have any legal effect.

App. at 7 (alteration in original).

Dow and Destec provided information about Destec to potential bidders in several other ways. First, Destec officers gave a presentation to potential bidders, which AES representatives attended. Dow and Destec also sent certain documents to potential bidders and made others available in a room at a Destec facility in Houston, Texas. Further, Dow and Destec gave potential bidders a computer model to value the Destec assets. This model included assumptions about the expenses and revenues of the Elsta Plant. Lastly, Dow and Destec allowed AES, as part of its due diligence, to visit the Elsta Plant.

AES contacted Dow about the possibility of purchasing the international assets of Destec. Dow responded that it would prefer to sell all of Destec, rather than dispose of it piecemeal. As a result, AES approached NGC Corporation ("NGC") to propose submitting a joint bid for all of Destec, and a joint bid was subsequently made.

The AES/NGC joint bid was accepted by Dow. The transaction took place in two steps. First, NGC acquired all of the stock of Destec pursuant to an Agreement and Plan of Merger (the "Merger Agreement") entered into by Dow, Destec, and NGC. Second, AES purchased all of the international assets of Destec, including all of DEI's outstanding stock, pursuant to an Asset Purchase Agreement between AES and NGC.

Section 4.6 of the Merger Agreement, to which AES was not a party, provided as follows:

> Except for the representations and warranties contained in this Article IV, neither Dow nor any other person makes any other express or implied representation or warranty on behalf of Dow.

App. at 235. Article IV of the Merger Agreement contained two pages of representations and warranties of Dow. It warranted that it was duly organized as a corporation; that it was authorized to enter the agreement; that the execution and consummation of the agreement would not violate the terms of any court order or Dow contract; that no government approval was necessary; and that no broker was entitled to a fee in connection with the transaction. Article IV contained no representation or warranty with respect to the Elsta Plant.

Similarly, Section 3.4 of the Asset Purchase Agreement, signed by NGC and AES, states that "except for the representations and warranties contained in this Article III, neither NGC nor any other person (as defined in the Merger Agreement) makes any other express or implied representation or warranty on behalf of NGC." App. at 280-81, Section 3.4. The Merger Agreement defines "Person" to "mean an individual, partnership, joint venture, trust, corporation, limited liability company or other legal entity or Governmental Entity." App. at 216. Article III of the

Asset Purchase Agreement contains limited representations and warranties by NGC very similar to those made by Dow in the Merger Agreement.

The Merger Agreement provided that "[t]his Agreement and the Confidentiality Agreement, and certain other agreements executed by the parties hereto as of the date of this Agreement, constitute the entire agreement, and supersedes (sic) all prior agreements and understandings (written and oral), among the parties with respect to the subject matter hereof." App. at 265, Section 9.9.

According to AES, shortly after purchasing DEI and Destec's other international assets, it realized that the Elsta Plant would cost far more to complete than its due diligence investigation had indicated and would open for operation much later than Dow and Destec had represented it would. Instead of providing the predicted $31 million in profit, the project ultimately occasioned a $70 million loss. AES contends that Dow knew specific facts about the Elsta Plant that contradicted the representations it had made prior to and during due diligence. Its complaint alleges fourteen affirmative misrepresentations and eight material omissions upon which it relied. Some involved profit and cost projections, but others involved currently existing facts. Further, AES contends that, as part of the scheme to defraud, Dow concealed the true state of the Elsta Plant and frustrated its due diligence efforts by causing Destec and its employees to provide false and misleading information to AES.

The District Court's opinion refers to all of the above quoted provisions of the transaction documentation and "concludes that the 'no representation/non-reliance' clauses in the agreements between Dow and AES are enforceable." App. at 15. The reference to "agreements between Dow and AES" is not clear to us, but we assume for present purposes that AES's commitment in the Confidentiality Agreement was made for the benefit of Dow and, if enforceable, is enforceable by it. In that document, AES "acknowledge[d]" that no "express or implied representations or warranty as to the accuracy or completeness of the Information" had been made and agreed (1) that Destec and Dow would not have "any

liability relating to the Information" and (2) that AES would be entitled to rely solely on the representations and warranties it would be able to secure in "any definitive agreement." App. at 197, ¶ 5. In order to avoid further repetition of this acknowledgment and agreement, we will refer to them hereafter as the "non-reliance" clause.

## III. *Analysis*

### A. *The Federal Law*

Section 10(b) of the Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security[,] . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, which was promulgated to implement Section 10(b), makes it unlawful for anyone engaged in the purchase or sale of a security to:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which the were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5. "To state a valid claim under Rule 10b-5, a plaintiff must show that the defendant 'made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury.'" *Semerenko v. Cendant Corp.*, 223 F.3d 165, 174 (3d Cir. 2000).

The "reasonable reliance" element of a Rule 10b-5 claim requires a showing of a causal nexus between the

misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests. *Straub v. Vaisman and Co., Inc.*, 540 F.2d 591, 597-98 (3d Cir. 1976). In *Straub*, we identified a non-exclusive set of factors to aid in determining whether a party's reliance was reasonable under all of the circumstances. We noted that courts may consider (1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information. *See id.* at 598.

The District Court held that as a result of AES's contractual commitment not to rely on any representations other than those incorporated in the final agreements, its alleged reliance was unreasonable as a matter of law. AES insists that this holding is incorrect in light of Section 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a). Section 29(a) provides: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." 15 U.S.C. § 78cc(a). That is, by its terms, Section 29(a) "prohibits waiver of the substantive obligations imposed by the Exchange Act." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 228 (1987). The underlying concern of this section is "whether the [challenged] agreement weakens [the] ability to recover under the Exchange Act." *Id.* at 230 (quotation omitted).

## B. *The Applicable Law*

AES emphasizes that the Merger and Asset Purchase agreements stipulated that Delaware law would govern their interpretation and insists that we must look to that law to determine the effect to be given the non-reliance clause. While we will not rule out the possibility that state law may play a role in some situations involving a Rule 10b-5 claim, we conclude that it has no role here. Reasonable reliance is an element of a federal law claim and what constitutes

such reliance is a matter of federal law. Federal law calls for the determination of reasonableness to be made on a case-by-case basis based on all of the surrounding circumstances. The terms of any agreement between the parties may be among these relevant circumstances and, if there is a material dispute about what the parties agreed to, reliance on state contract law may be appropriate to resolve that dispute.

The Delaware cases relied upon by AES, however, do not involve rules of contract interpretation. Primary reliance, for example, is placed upon *Norton v. Poplos*, 443 A.2d 1 (Del. 1982), which involved a contract to sell commercial real estate in which the parties had represented that they "do not rely on any written or oral representations not expressly written in the contract." *Id.* at 6. The Delaware Supreme Court held that Delaware law will not enforce such a clause to bar a common law rescission claim based on fraudulent, or "innocent but material[,] misrepresentation by a seller." *Id.* AES and Dow dispute whether this is an across-the-board rule of Delaware law or whether its application is limited to non-negotiated contracts between unsophisticated parties.[2] We need not resolve that issue; the issues of what constitutes an anticipatory waiver of a federal securities claim and whether a purported anticipatory waiver of such a claim is enforceable are matters of federal law. *See Newton v. Rumery*, 480 U.S. 386 (1987) ("the agreement purported to waive a right to sue conferred by a federal statute. The question whether the policies underlying that statute may in same circumstance render that waiver unenforceable is a question of federal law.").

## C. *The Role of the Non-Reliance Clause*

This brings us back to Section 29(a) of the Exchange Act which forecloses anticipatory waivers of compliance with

---

2. *Compare, e.g.*, *Progressive International Corp. v. E.I. duPont deNemours & Co.*, ___ A.2d ___, 2002 Del. Ch. LEXIS 91 (Del. Ch., July 9, 2002), and *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544 (Del. Ch. 2001), with *S.C. Johnson & Son, Inc. v. Dowbrands, Inc.*, 167 F. Supp. 2d 657, 674 (D. Del. 2001).

the duties imposed by Rule 10b-5. We believe the conclusion inescapable that enforcement of the non-reliance clauses to bar AES's fraud claims as a matter of law would be inconsistent with Section 29(a).

As we have noted, reliance is an essential element of a Rule 10b-5 claim. It necessarily follows that, if a party commits itself never to claim that it relied on representations of the other party to its contract, it purports anticipatorily to waive any future claim based on the fraudulent misrepresentations of that party. The same is true if the commitment is more limited, e.g., a promise not to claim reliance on any representation not set forth in the agreement. The scope of the anticipatory waiver is more limited, but it is nevertheless an anticipatory waiver of potential future claims under Rule 10b-5.

We, thus, find ourselves in agreement with the conclusion of the Court of Appeals for the First Circuit in *Rogen v. Ilikon*, 361 F.2d 260 (1st Cir. 1966). There, a stockholder and former officer and director of the defendant company brought suit alleging that during negotiations for the sale of his stock after his separation from the company, officers and directors of the defendant corporation failed to disclose material information about the possibility of new prospects for the company. In the agreement to sell his stock, plaintiff represented that he was familiar with the business of the company and that he was not relying on any representations of the purchaser or its agents. In addressing the propriety of this type of contractual provision under the Exchange Act, the Court concluded:

> This [type of contract clause] is not, in its terms, a "condition, stipulation, or provision binding . . . [plaintiff] to waive compliance" with the Securities Act of 1934 as set forth in Section 29(a) of the Act, (15 U.S.C. § 78cc(a)). But, on analysis, we see no fundamental difference between saying, for example, "I waive any rights I might have because of your representations or obligations to make full disclosure" and "I am not relying on your representations or obligations to make full disclosure." Were we to hold that the existence of this provision constituted the basis (or a substantial part of the basis) for finding

> non-reliance as a matter of law, we would have gone far toward eviscerating Section 29(a).

361 F.2d at 268 (alterations in original).

As the *Rogen* court noted, this is not to say that a plaintiff's declaration in a contract of an intent not to rely may not be evidence that he or she did not rely on representations of the defendants. That declaration, alone or in conjunction with other evidence of non-reliance, may establish an absence of reliance and, when unrebutted, may even provide a basis for summary judgment in the defendant's favor. Thus, in this case, the non-reliance clauses are some evidence of an absence of reliance. However, the District Court did not find that the evidence of non-reliance was unrebutted. Indeed, Dow does not contend that the information provided by it and its associates played no material role in AES's decision to enter the agreement.

Dow does contend, and we understand the District Court to have held, that the non-reliance clauses establish as a matter of law that any reliance of AES was unreasonable reliance. We find the same tension between Section 29(a) and this argument, however, as we have found between Section 29(a) and the argument that the non-reliance clauses foreclose an assertion by AES that it relied. If all of the evidence bearing on the reasonableness of AES's reliance does not entitle Dow to summary judgment under traditional summary judgment principles, it would offend Section 29(a) to bar its claim based solely on a contractual commitment not to claim reliance.

## IV. *The Issue for Decision on Remand*

This leaves for resolution the issue of whether, viewing all of the relevant circumstances and applying the reasonable reliance standard set forth in *Straub*, a reasonable trier of fact could only conclude that AES failed to exercise ordinary care in protecting its own interest. We decline to address that issue, however, because we conclude that it is premature to do so.

Dow did not argue to the District Court that it was entitled to summary judgment because an application of

the principles of *Straub* to all of the relevant circumstances of this case could lead only to one conclusion. It candidly acknowledged that the record was undeveloped with respect to AES's investigation and its failure to discover the facts it learned after settlement. It insisted, however, that the record had established the only fact necessary to require summary judgment in its favor — the existence of the non-reliance clause. Stated otherwise, Dow's argument is that it is impossible for a buyer to show reasonable reliance in any case where there is a non-reliance clause. Faced with this argument, AES understandably did not file affidavits or verify its complaint, although it did file a Rule 56(a) affidavit pointing out the need for discovery.

The non-reliance clauses are, of course, among the circumstances to be considered in determining the reasonableness of any reliance here. Importantly, they reflect the fact that the seller was unwilling to vouch for the accuracy of the information it was providing and the fact that the buyer was willing to undertake to verify the accuracy of that data for itself. Clearly, in such circumstances, a buyer who relies on seller-provided information without seeking to verify it has not acted reasonably. Clearly, a buyer in a non-reliance clause case will have to show more to justify its reliance than would a buyer in the absence of such a contractual provision. For this reason, cases involving a non-reliance clause in a negotiated contract between sophisticated parties will often be appropriate candidates for resolution at the summary judgment stage. We are unwilling, however, to hold that the extraction of a non-reliance clause, even from a sophisticated buyer, will always provide immunity from Rule 10b-5 fraud liability.

AES's complaint alleges that Dow and its subsidiaries were in exclusive control of the information necessary to accurately evaluate the Elsta Plant. It further alleges that, as a part of its fraudulent scheme to sell DEI to someone at a price far above its worth, Dow controlled release of the relevant information to AES both initially as well as during the period that it was conducting its investigation to determine the accuracy of the information initially disclosed. Much of that information involved projections

and other "soft" data that a seller dealing in good faith would understandably be unwilling to guarantee. According to AES, it conducted a diligent investigation that was reasonably calculated to determine the reliability of Dow's representations but revealed no reason to suspect that Dow was intentionally misleading it. Dow allegedly saw to it that all information received by AES would reassure it of the reliability of the earlier supplied data; Dow allegedly also prevented AES from securing the data in Dow's and Destec's files that would have disclosed the fraud.

In its Rule 56(e) affidavit, AES seeks discovery of information in the exclusive possession of Dow to support AES's claim that Dow and Destec intentionally concealed their fraudulent conduct, restricted its access to truthful information, and accelerated the transaction to prevent AES from discovering the true status of the construction at the Elsta Plant.

With this as background, AES points to our observation in *Straub*:

> [A] sophisticated investor is not barred [from] reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced. Integrity is still the mainstay of commerce and makes it possible for an almost limitless number of transactions to take place without resort to the courts.

*Straub*, 540 F.2d at 598 (citations omitted). AES argues that a reasonable investor, in its position, trusting in the integrity of the seller, would have understood the seller's unwillingness to guarantee the truth of the supplied data as something other than a warning that it was unreliable[3]

---

3. In *Semerenko*, 223 F.3d at 181, we upheld the dismissal of some of the plaintiffs' Rule 10b-5 claims against the accounting firm of Ernst & Young on the ground that the plaintiffs could not reasonably have relied upon its audit opinions after the company publicly announced the discovery of accounting irregularities and warned investors not to rely on its prior financial statements and audit reports. Dow cites *Semerenko* for the proposition that there is no need here to consider all of the circumstances in determining the reasonableness of plaintiff's reliance. The cases are not analogous, however. Dow was not saying to potential

and would have been willing to rely upon an unimpeded investigation of its own.

While AES may have an uphill battle here and summary judgment for the defendants may be appropriate at some point, we decline to give controlling significance to the existence of a non-reliance clause in a vacuum. We fully appreciate that the avoidance of costly discovery is one of the objectives of negotiating such clauses. Nevertheless, to hold that a buyer is barred from relief under Rule 10b-5 solely by virtue of his contractual commitment not to rely would be fundamentally inconsistent with Section 29(a). Given this legislative directive, parties in Dow's position will have to rely upon discovery management and the summary judgment process to ameliorate the discovery burden.

In reaching this conclusion, we have not been unmindful of the decision of the Court of Appeals for the Second Circuit in *Harsco Corp. v. Sequi*, 91 F.3d 337 (2d Cir. 1996). The court there affirmed the dismissal of a Rule 10b-5 security fraud claim based on a stipulation in the stock purchase agreement that the sellers were "not [to] be deemed to have made . . . any representation or warranty other than as expressly made by" the sellers in the agreement. *Id.* at 342. The *Harsco* court rejected the purchaser's argument that the District Court's dismissal had violated Section 29(a). Although acknowledging that "the underlying concern of § 29(a) is 'whether the agreement weakens the ability to recover under the Exchange Act'" and that the agreement before it could accurately be described as doing precisely that, the Court nevertheless found the "no other representation" clause enforceable:

> Thus, the Agreement can be described as weakening Harsco's ability to recover under § 10(b) of the Exchange Act. We think, however, that in the circumstances of this case such a "weakening" does not

___

investors that it was supplying unreliable data that should not be relied upon. Rather, it was communicating only that it was not willing to absorb the risk of guaranteeing the data it was tendering to potential investors for use in evaluating DEI without having been paid for doing so as part of the contract price.

constitute a forbidden waiver of compliance. Here there is a detailed writing developed via negotiations among sophisticated business entities and their advisors. That writing, we conclude, defines the boundaries of the transaction. Harsco brings this suit principally alleging conduct that falls outside those boundaries.

\* \* \*

Harsco bought Section 2.04's fourteen pages of representations. Unlike a contractual provision which prohibits a party from suing at all, the contract here reflects in detail the reasons why Harsco bought Multi-Serv—in essence, Harsco bought the representations and, according to Sections 2.05 and 7.02, nothing else. This means that there are fourteen pages of representations, any of which, if fraudulent, can be the basis of a fraud action against the sellers. But Harsco specifically agreed that representations not made in those fourteen pages were not made. Thus, it is not fair to characterize Sections 2.05 and 7.02 as having prevented Harsco from protecting its substantive rights. Harsco rigorously defined those rights in Section 2.04.

This analysis becomes a question of degree and context. Harsco has not waived its rights to bring any suit resulting from this deal. Each representation in Section 2.04 is a tooth which adds to the bite of Sections 2.05 and 7.02. In different circumstances (e.g., if there were but one vague seller's representation) a "no other representations" clause might be toothless and run afoul of § 29(a). But not here.

*Id.* at 343, 344.

We find *Harsco*'s reasoning unpersuasive. Section 29(a) is not intended to protect substantive rights created by contract. It is designed to protect rights created by the Exchange Act, and it expressly forecloses contracting parties from "defin[ing] the boundaries of the[ir] transaction" in a way that relieves a party of the duties imposed by that Act. We do not dispute that there may be economic efficiency in allowing private parties the freedom to fashion their own bargains. But Congress has made a decision to limit that freedom when it comes to anticipatory

waivers of Exchange Act claims. Accordingly, we conclude that we must side with the First Circuit Court of Appeals in *Rogen* rather than with the *Harsco* court.[4]

In addition to *Harsco*, Dow relies on *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988), *Jackvony v. RIHT Finan. Corp.*, 873 F.2d 411 (lst Cir. 1989), and *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000). None of these cases address § 29(a). Moreover, as we read them, each provides some support for the approach we hold that the District Court should have taken here — treat the existence of the non-reliance clause as one of the circumstances to be taken into account in determining whether the plaintiff's reliance was reasonable. *See* the analysis of these decisions in *Rissman*, 213 F.3d at 387-389 (Rovner, J., concurring). As the District of Columbia Court of Appeals has observed in commenting on *One-O-One*, a contrary reading "would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate." *Id.* at 388.

## V. *Conclusion*

The judgment of the District Court will be reversed and this matter will be remanded for further proceedings consistent with this opinion.

---

4. The *Harsco* court distinguishes *Rogen* on the grounds that it did not involve sophisticated parties or as detailed an agreement as that before it. We do not understand *Rogen* to turn on these factors. Nor do we believe § 29(a) to be susceptible of reading that would make an exception for sophisticated parties and detailed agreements.

WALLACE, J. Clifford, Senior Circuit Judge, concurring and dissenting:

I agree the case should be reversed, but disagree on the evidentiary use of the stipulations and waivers on remand.

Section 29(a), 15 U.S.C. § 78cc(a), states, "Any . . . stipulation . . . binding any person to waive compliance with [the Securities Exchange Act] . . . shall be void." AES and Dow's stipulations are waivers of compliance, and under the express terms of section 29, they are "void." The majority holds that the void stipulation can nonetheless be evidence of the reasonableness of AES's reliance. I write separately because I cannot join in the majority's interpretation of the word "void."

A void clause is "of no effect whatsoever." BLACK'S LAW DICTIONARY 1568 (7th ed. 1999). It is "an absolute nullity." ID. It is "ineffective," "useless," "having no legal force or validity." THE AMERICAN HERITAGE DICTIONARY 911 (4th ed. 2001). If we permit the void stipulation to have evidentiary value, it is no longer a nullity, ineffective, or useless. Instead, it becomes a very potent weapon in the 10b-5 defendant's arsenal. This is precisely what section 29(a) prohibits.

At its core, section 29 seeks to prevent parties from contractually avoiding the requirements of Rule 10b-5. If the void stipulation may be evidence in a later Rule 10b-5 claim, how likely is it that the seller of securities will lose the 10b-5 claim? Imagine the mountains of evidence the 10b-5 plaintiff will need to compete with the evidence of the stipulation. Realistically, how will a plaintiff convince a reasonable juror that he reasonably relied on a representation when he signed a provision that stated otherwise? To permit the void stipulation to serve as evidence of a lack of reasonable reliance would be to take the teeth out of section 29. It would make a 10b-5 claim logically possible, but essentially hopeless. Congress meant more when it enacted section 29(a).

18

A True Copy:
Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*