In re MEDICAL WIND DOWN HOLDINGS III, INC. (f/k/a Maxxim Medical, Inc.), Debtor.

Medical Wind Down Holdings III, Inc. (f/k/a Maxxim Medical, Inc.), Plaintiff,

v.

InnerDyne, Inc., Defendant.

Bankruptcy No. 03–10441(PJW).

Adversary No. 05–50389(PJW).

United States Bankruptcy Court, D. Delaware.

Oct. 5, 2005.

Jeffrey C. Wisler, Marc J. Phillips, Connolly, Bove, Lodge & Hutz, LLP, Wilmington, DE, David A. Forkner, Michael P. Moreland, Williams & Connolly LLP, Washington, D.C., Counsel for Defendant InnerDyne, Inc.

Brendan Linehan Shannon, Matthew B. Lunn, Margaret Whiteman, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, Richard Mancino, Michael J. Kelly, Willkie, Farr & Gallagher LLP, New York, NY, Co–Counsel for Plaintiff.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

In this adversary proceeding defendant InnerDyne, Inc.'s ("InnerDyne") motion (Doc. # 6) seeks to dismiss the three counts of plaintiff Medical Wind Down Holdings III, Inc.'s (f/k/a Maxxim Medical, Inc.) ("Maxxim") complaint. For the reasons set forth below, InnerDyne's motion will be denied.

## BACKGROUND

On February 11, 2003, Maxxim and its related entities filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). On October 28, 2003, this Court approved the sale of substantially all of Maxxim's assets. On November 10, 2003, the sale closed and Maxxim ceased all ongoing business operations. On May 17, 2004, the Court confirmed Maxxim's plan of liquidation.

The instant matter arises out of a dispute between Maxxim and InnerDyne over certain actions taken by the parties during Maxxim's prepetition business operations. On February 2, 2000, InnerDyne sent Maxxim a letter (the "February Letter") describing a novel proprietary vascular access method (the "Device"). When Maxxim received the February Letter, it was in the business of developing, manufacturing, and marketing specialty medical products. The letter indicated that due to InnerDyne's limited synergies with its distribution channel, InnerDyne was interested in pursuing a strategic marketing and distribution alliance with Maxxim. This alliance would allow both parties to take full advantage of InnerDyne's innovation.

The February Letter advised that this innovation promised to shorten a patient's stay in the hospital after a vascular access procedure. To do this, the Device used radial dilation to prevent blunt trauma to the vein. This method would minimize the puncture wound associated with the insertion of a vascular access device; the smaller the puncture wound, the shorter the patient's hospital stay. (Doc. # 1, Exh. A).

The February Letter represented that the Device achieved such results without any vascular access complications. Further, the February Letter stated that InnerDyne had conducted over 400 test cases in the United States and Europe and had completed a pilot study at the William Beaumont Hospital. According to Inner-Dyne, the results of these clinical tests had shown that the Device could achieve at least a 50% reduction in time to ambulation without any increase in vascular access complications. (Doc. # 1, Exh. A).

Less than two months after receiving the February Letter, Maxxim agreed to the proposed strategic alliance with Inner-Dyne by entering into the Supply, License and Distribution Agreement ("the Agreement"). Maxxim's complaint alleges that the Device did not work as promised because it failed to decrease patient recovery time. Further, Maxxim alleges that the Device provided no benefits to either patient or doctor. As a result, Maxxim states it was unable to successfully market the Device.

The complaint asserts that InnerDyne led Maxxim to believe that substantial testing, clinical evaluations, and reliable data supported InnerDyne's representations of the Device's benefits. Maxxim alleges that such representations were false and that InnerDyne knew that such representations were false when made or, alternatively, that InnerDyne made such representations with reckless disregard for their veracity.

These representations, which Maxxim allegedly relied on, are said to have materially impacted the sale of the Device and resulted in harm to Maxxim. Accordingly, Maxxim claims that but for such misrepresentations, it would not have entered the Agreement with InnerDyne. In addition, Maxxim asserts that InnerDyne failed to supply it with a Device that was "free from defects in all respects" under the terms of the Agreement. Thus, the complaint contains claims for fraud in the inducement, negligent misrepresentation, and breach of contract.

By its motion, InnerDyne argues that the complaint should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)6 and 9(b).[1] InnerDyne asserts that the complaint fails to state a claim for fraud or negligent misrepresentation because Maxxim has not alleged a false representation of material fact and Maxxim cannot establish justifiable reliance as a matter of law. Also, InnerDyne asserts that the complaint fails to state a claim for breach of contract because Maxxim has not alleged a defect that is covered by the Agreement and Maxxim has failed to satisfy all conditions precedent. Maxxim contests all of these assertions.

Section 11(a) of the Agreement provides that the governing law is the State of Delaware.

## DISCUSSION

A motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule 12(b)(6) serves to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993).

---

1. Both of these rules are incorporated here by     Bankruptcy Rules 7012 and 7009.

When deciding such a motion, a court accepts as true all allegations in the complaint and draws all reasonable inferences from it which the court considers in a light most favorable to the plaintiff. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997); *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir.1989). A court should not grant a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

▪ Federal Rule of Civil Procedure 9(b) requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). The purpose of this rule is to "place the defendants on notice of the precise misconduct with which they are charged ...." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

The allegations, as discussed below, are sufficiently stated as to put InnerDyne on notice to the specific misconduct alleged.

▪ A successful claim of fraud must establish: "1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983). Similarly, a claim of negligent misrepresentation requires the same elements, except the plaintiff need not demonstrate that the misrepresentation was made knowingly or recklessly.

*Zirn v. VLI Corp.*, 681 A.2d 1050, 1061 (Del.1996). Because justifiable reliance is an element of both claims, the failure of such reliance will be fatal to a claim of fraud in the inducement or negligent misrepresentation. *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, No. C.A. 19209, 2002 WL 1558382, at *7 (Del.Ch. July 9, 2002).

Contrary to InnerDyne's assertions, the complaint alleges, and at this stage the Court must accept as true, facts sufficient to make out claims of fraud and negligent misrepresentation. The complaint states that the Device was represented as a system for vascular access, which through the "use [of] radial dilation ... prevent[s] blunt trauma to the vein and minimize[s] the puncture wound...." (Doc. # 1, ¶ 16). "There is a relationship between puncture size incurred during the vascular access and the time to patient recovery. Therefore, a system which limits the size of the arterial puncture is beneficial." (Doc. # 1, ¶ 16). More specifically, the Device was supposed to "enable[ ] the benefits of early ambulation without an increase in vascular access complications." (Doc. # 1, ¶ 13)(internal quotations omitted). But after Maxxim received shipment, "the Device did not deliver on the explicit promises of reduced patient treatment time." (Doc. # 1, ¶ 18). Rather, the Device "simply provided no benefits to either the patient or the doctor." (Doc. # 1, ¶ 25).

Thus, the complaint asserts that Inner-Dyne made representations to Maxxim; these representations promised an innovative Device that provided certain benefits. The complaint alleges that these promised benefits were never realized and were material in nature. In addition, the complaint alleges that InnerDyne had the requisite scienter: "[u]pon information and belief, InnerDyne knew that it did not have support or data sufficient to make conclusive

statements regarding the benefits of the Device . . . ." (Doc. # 1, ¶ 17).

Further, Maxxim has sufficiently alleged that InnerDyne improperly induced Maxxim into entering the Agreement. For example, the complaint states "Plaintiff was led to believe that substantial testing and clinical evaluations had been done by InnerDyne over the course of at least two years, and that there was reliable data to support the claims made therein." (Doc. # 1, ¶ 26). As a result, less than two months after receiving the February Letter, Maxxim entered into the Agreement. (Adv.Doc. # 1, ¶ 14).

Maxxim asserts that it would not have entered the Agreement "but for such misrepresentations." (Doc. # 1, ¶ 41). For Rule 12(b)(6) purposes, this constitutes a showing of justifiable reliance. Also, because the Device did not confer the benefits described in the February Letter and promised in the Agreement, Maxxim was unable to market the Device. (Doc. # 1, ¶ 21). Accordingly, Maxxim has properly pleaded damages as a result of its alleged reasonable reliance.

InnerDyne asserts that allegations in the complaint mischaracterize the content of the February Letter. I disagree. I find the complaint fairly characterizes the content of the February Letter. In any event, if one relies only on the February Letter, and not the complaint's characterization of it, one can easily conclude that in the February Letter InnerDyne represented (a) that it had expertise with respect to the Device, (b) that it developed the Device over a number of years, (c) that it had conducted clinical studies and a small pilot hospital study and (d) that the Device had significant benefits over other similar devices used at that time. InnerDyne's unequivocal touting of the Device is clear: "Our clinical findings have shown that we can achieve at least a 50% reduc-

tion in the time to ambulation without an increase in complications compared to standard 6F-sheath access." (Doc. # 1, Exh. A). The February Letter goes on to state that InnerDyne is "pursing a strategic marketing alliance that will allow us to fully capitalize on the potential of this device." (Doc. # 1, Exh. A). In closing, the February Letter inquired of Maxxim whether it was interested in establishing a "strategic marketing and distribution relationship." (Adv.Doc. # 1, Exh. A).

■ InnerDyne asserts that the February Letter's recitals are mere opinions as to possible future occurrences. It is the law in Delaware that "mere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud or misrepresentations." *Consol. Fisheries Corp. v. Consol. Solubles, Corp.*, 112 A.2d 30, 37 (Del.1955). Contrary to InnerDyne's assertion, the February Letter makes a number of representations that cannot be characterized as "opinions concerning probable future events." For example, the February Letter begins: "InnerDyne has developed a proprietary vascular access method, which enables the benefits of early ambulation without an increase in vascular access complications." (Doc. # 1, Exh. A). The letter describes the benefits of the Device and recites that the clinical findings are the results of over 400 cases in the United States and Europe and that it had conducted a small pilot study. (Doc. # 1, Exh. A). Thus, the February Letter clearly makes representations regarding the quality and performance characteristics of the Device and makes those representations in the context of an invitation to Maxxim to market the Device and the complaint alleges that in reliance on those representations and invitations, Maxxim entered into the Agreement.

InnerDyne argues that Maxxim's reliance as pleaded is unjustifiable as a matter of law. According to InnerDyne, the integration clause contained in the Agreement precludes, as a matter of law, Maxxim from reasonably relying on the February Letter or any other assurances or representations that InnerDyne may have made to Maxxim that were not contained in the Agreement. Section 11(c) of the Agreement contains the following integration provision:

> *Entire Agreement.* This Agreement sets forth the entire Agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the party to be charged.

(Doc. # 1, Exh. B).

Maxxim argues that this integration clause does not, without more, operate as a bar to establishing reasonable reliance; rather, Maxxim urges that the contractual language contained in the Agreement is not sufficiently explicit to prohibit a party from relying on prior written representations.

The Delaware Supreme Court has not offered any definitive conclusion on the interaction between anti-reliance provisions and fraud claims. *CERAbio LLC v. Wright Med. Tech., Inc.,* 410 F.3d 981, 991 (7th Cir.2005). Although neither party has cited *Norton v. Poplos,* 443 A.2d 1 (Del. 1982), it is a 23–year–old Delaware Supreme Court case that "appears to categorically hold that non-reliance provisions in contracts will not bar subsequent actions for fraud." *S.C. Johnson & Son, Inc. v. DowBrands Inc.,* 111 Fed.Appx. 100, 106–07, 2004 WL 2203974, at *5 (3d Cir. Sept 30, 2004) (*citing Norton,* 443 A.2d at

6). "However, any attempt to apply *Norton* is complicated by a line of later cases decided by the Delaware Chancery Court . . . ." *Id.* These later Chancery Court cases have read *Norton* as turning on the relatively unsophisticated disposition of the parties. In the Chancery Court cases that found anti-reliance clauses could preclude reliance on facts outside the contract, the provisions were comprehensive and detailed-unlike the clause at issue here. *See, e.g., H–M Wexford v. Encorp, Inc.,* 832 A.2d 129, 141–42 (Del.Ch.2003); *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 552 (Del.Ch.2001); *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.,* No. C.A. 19209, 2002 WL 1558382, at *5 (Del.Ch. July 9, 2002).

Thus, although the Delaware Chancery Court has permitted some contractual disclaimers to prohibit claims of fraud, a clause agreeing to bar such a claim must be explicit. *See Great Lakes,* 788 A.2d at 556 ("Delaware law permits explicit contract disclaimers to bar . . . fraud claims."). This is consistent with the objective theory of contracts to which Delaware adheres. *Progressive,* No. C.A. 19209, 2002 WL 1558382, at *7 (Del.Ch. July 9, 2002). That theory presumes "that the language of a contract governs *when no ambiguity exists.*" *Id.* (emphasis added). Most recently, the Chancery Court explained that "[b]ecause Delaware's public policy is intolerant of fraud, the intent to preclude reliance on extra-contractual statements must emerge clearly and unambiguously from the contract." *Kronenberg v. Katz,* 872 A.2d 568, 593 (Del.Ch. 2004), *aff'd without op.,* 867 A.2d 902 (Del. 2005). In other words, "contractual provisions cannot preclude reasonable reliance unless they constitute, when taken together, a clear promise by the plaintiffs that they were relying only on the representations in the contract itself . . . ." *Id.* at 575.

The issue presented then is whether the intent to preclude reliance emerges clearly and unambiguously from the language contained in the contract. Examples of clear and unambiguous promises generally have multiple lengthy clauses that include phrases such as the following: (1) "... Party has not executed ... [the] instrument in reliance upon any such promise, representation, or warranty ...," *Progressive,* No. C.A. 19209, 2002 WL 1558382, at *5 (Del.Ch. July 9, 2002), (2) "... Buyers confirm that they have not relied on any warranty, representation, indemnity, covenant or undertaking ...," *DCV Holdings, Inc. v. ConAgra,* No. Civ. A. 98C–06–301JEB, 2002 WL 508343, at *5 (Del.Super.Ct. April 1, 2002), rev'd in part on unrelated grounds, 822 A.2d 396 (Del. 2003), and (3) "[t]he parties further declare that they have not relied upon any representation ..." *Rissman v. Rissman,* 213 F.3d 381, 383 (7th Cir.2000).

In *Homan v. Turoczy,* No. Civ. A. 19220, 2005 WL 2000756, at * 17–18 (Del. Ch. August 12, 2005), the Chancery Court, after a trial on the merits, determined that the plaintiffs' claim of fraud must fail because their reliance was unreasonable. In that case, the court found that the plaintiffs had agreed to be bound by not one, but three different anti-reliance clauses. *Id.* The first clause recited that *"there are no oral agreements, understandings, or representations relied upon by the parties." Id.* at *16 (emphasis in original). The second clause similarly stated in part that *"Buyer and Seller agree that they have read and fully understand this Agreement, that it contains the entire agreement between them and that they do not rely on any written or oral representation or statement not expressly written in this Agreement." Id.* (emphasis in original). Finally, the third clause declared in part that "[w]e have not relied on the representations ... in connection with the

subject matter of the sale ...." *Id.* The court then likened the facts to *Great Lakes* and *H–M Wexford. Id.* at *17. According to the Court of Chancery, *Great Lakes* and *H–M Wexford* stand for the proposition that "repeated express indications by the [plaintiffs] ... that they were not relying on any oral representations are ... binding in the commercial contract formation process." *Id.*

■ In *Great Lakes,* the court barred a plaintiff's claim of fraud due to three contractual provisions. *Great Lakes,* 788 A.2d at 552. None of the three provisions included an integration clause and none of the three provisions contained the words rely or reliance; rather, the provisions disclaimed liability regarding estimates, projections, and other forecasts. *Id.* The three heavily negotiated provisions were agreed upon "after months of extensive due diligence" and with the aid of "industry consultants and experienced legal counsel." *Id.* at 555. As such, the court concluded that the "carefully negotiated and crafted" agreement was "clear" and prohibited the plaintiff's claims of fraud. *Id.* at 556. As seen by the disclaimers in *Great Lakes,* to foreclose reasonable reliance, the clause or clauses need not necessarily contain the words "rely" or "reliance"; but such provisions must "clearly" and "explicitly" promise not to rely. *But see Slack v. James,* 364 S.C. 609, 617, 614 S.E.2d 636 (S.C.2005) ("[A] non-reliance clause would contain the words, 'rely' or 'reliance' and set forth a statement that the parties could not or did not rely on the representations of the other party.").

*Great Lakes* thus demonstrates the type of language and circumstances that courts applying Delaware law have required to bar a claim of fraud in the inducement. *Kronenberg,* in contrast, illustrates the type of language and circumstances that

Delaware courts have deemed insufficient to bar a claim of fraud. The language in *Kronenberg* that was held to be insufficiently clear was as follows:

> Entire Agreement. This Agreement, which includes the Exhibits and shall include any Joinders upon execution thereof, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, inducements, or conditions, oral or written, express or implied.

*Kronenberg v. Katz,* 872 A.2d 568, 587 (Del.Ch.2004), *aff'd without op.,* 867 A.2d 902 (Del.2005).

In the court's words, such language failed to "forthrightly affirm" that the parties were not relying on any representation or statement not contained within the contract. *Id.* at 591. In reaching that conclusion, the court explained that the traditional interpretation of such language is that it "operates to police the variance of the agreement by parol evidence," and that "typical integration clauses do not operate to bar fraud claims based on factual statements not made in the written agreement." *Id.* at 592 (*citing* 2 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.4, at 247 (3d ed.2003); JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS § 84(C)(2), at 440–41 (4th ed.2001); RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. c (1981); 11 RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS BY SAMUEL WILLISTON § 33:21, at 670–71 (4th ed.1999); 2 RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2–202:54, at 286 (3d ed.1997 revision)).

As noted above, here we have a one sentence integration provision:

> This Agreement sets forth the entire Agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.

(Doc. # 1, Exh. B).

Section 11(c) refers to "all prior discussions" between the parties. But the February Letter was not a discussion between the parties; rather, it was a one-way communication from InnerDyne to Maxxim. Moreover, the clause at issue here is even more general than the clause in *Kronenberg.* Under *Kronenberg* and the line of Chancery Court decisions, such a clause as the one here does not, without more, foreclose, as a matter of law, the possibility of justifiable reliance. *Id.*

InnerDyne's reply brief characterizes *Kronenberg* as "an unpublished decision from the Delaware Chancery Court," which "held that the contractual disclaimer at issue was boilerplate and, therefore, did not constitute a clear and unambiguous expression of non-reliance." (Doc. # 11, p. 8) *Kronenberg,* which has since been published and affirmed by the Delaware Supreme Court, turned on more than just whether the contractual disclaimer was boilerplate. *Kronenberg v. Katz,* 872 A.2d 568, 587 (Del.Ch.2004), *aff'd without op.,* 867 A.2d 902 (Del.2005). If *Kronenberg* held as InnerDyne suggests, then InnerDyne's position would be even weaker. Putting aside *Norton,* all boilerplate contractual disclaimers do not automatically fail, rather "[t]he issue of reasonable reliance has always depended upon an analysis of all relevant circumstances." *Rissman v. Rissman,* 213 F.3d 381, 389 (7th Cir.2000) (Rovner, J. concurring).

Nonetheless, InnerDyne asserts that all three counts should be dismissed, bolstering its argument with citation to a number of federal authorities, specifically, *Rissman v. Rissman,* 213 F.3d 381 (7th Cir.

2000), *Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir.1996), *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411 (1st Cir.1989), and *One–O–One Enters., Inc. v. Caruso*, 848 F.2d 1283 (D.C.Cir.1988). The Third Circuit considered these authorities in *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 183 (3d Cir.2003), stating that "as we read them [*One–O–One*, *Jackvony*, and *Rissman*], each provides some support for the approach we hold that the District Court should have taken here—treat the existence of the non-reliance clause as one of the circumstances to be taken into account in determining whether the plaintiff's reliance was reasonable." Further, in *AES* the Third Circuit also looked at *Harsco* and considered its reasoning "unpersuasive." *Id.*

In reaching these conclusions, the Third Circuit referred to the *Rissman* concurrence, which discussed the reasoning of *Jackvony* and *One–O–One*. *Id.* The *Rissman* concurrence urged that a "non-reliance clause is but one factor, albeit a fairly convincing one" in determining whether reliance is reasonable. *Rissman*, 213 F.3d at 388 (Rovner, J. concurring). The concurring judge in that opinion concluded as follows:

> I write separately merely to avoid the inevitable quotes in future briefs characterizing our holding as an automatic rule precluding any damages for fraud based on prior oral statements when a non-reliance clause is included in a written agreement. The world is not that simple, and our holding today cannot be interpreted so simplistically. On the facts in this case, involving extensive negotiations aided by counsel and with numerous rejections of efforts to include the oral representations in the written agreement, the non-reliance clause ren-

dered any reliance on the prior statements unreasonable.

*Id.* at 389.

This statement is consistent with the other authorities on point.

For example, *Jackvony* held that reliance was unreasonable because "the prior statements were vague, Jackvony was a sophisticated investor, the written proxy statement instructed Jackvony not to rely on any other statements, Jackvony seemed anxious to expedite the transaction, and Jackvony helped draft the written acquisition documents." *Id.* at 388. Thus, *Jackvony* did not hold that an anti-reliance statement automatically bars fraud claims, but noted it as a factor that may make reliance unreasonable. *Id.*

Likewise, the *One–O–One* Court considered more than just the integration clause in making its determination. *Id.* Specifically, "the court noted that the parties reached the written agreement after eight months of vigorous negotiations ...." *Id.* In a subsequent decision, the D.C. Circuit explained that "our conclusion in ... [*One–O–One*] was plainly not intended to say that an integration clause bars fraud-in-the-inducement claims generally .... Such a reading would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate." *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C.Cir.1995) (citations omitted).

Finally, InnerDyne relies on the District Court opinion in *AES* for the proposition that the " 'no-representation/non-reliance' clauses in the agreements between Dow and AES are enforceable and any reliance upon alleged misrepresentations not in the agreement was unreasonable as a matter of law." (Doc. # 7, p. 9, n. 2). InnerDyne indicates that the District Court's opinion was reversed on unrelated grounds. *Id.* InnerDyne's assertion appears to come word-for-word from a footnote in a Dela-

ware Chancery Court opinion. *See St. James Recreation, LLC v. Rieger Opportunity Partners, LLC,* No. Civ. A. 19346, 2003 WL 22659875, at *3, n. 14 (Del. Ch. Nov 5, 2003). Nonetheless, the Third Circuit seems to have overturned the District Court on precisely these grounds. As a result, InnerDyne's reliance on the District Court opinion in *AES* is misplaced.

In this case, regardless of whether the integration clause is viewed as one factor or whether it is the exclusive factor, it cannot preclude reliance at this juncture. From the pleadings, there is no evidence that the parties viewed any clause in the Agreement as a bar to claims of fraud or misrepresentation. *See Kronenberg,* 872 A.2d at 592–93. At this point, the Court has nothing before it that would indicate that the Agreement or its integration clause were heavily negotiated, or even negotiated at all. What is presented is a very limited boilerplate integration clause that cannot be said to constitute a clear, explicit, and unambiguous promise by Maxxim not to rely on statements outside the Agreement's four corners.

Other sections of the Agreement, though relevant in the determining whether Maxxim's reliance is justifiable, do not add any further clarity to whether the integration clause must bar claims of fraud. Specifically, InnerDyne points to Section 4(c) of the Agreement, which provides:

> *No Other Warranty* OTHER THAN AS EXPRESSED HEREIN, INNERDYNE GRANTS NO OTHER WARRANTIES FOR THE INNERDYNE DEVICES EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, AND INNERDYNE SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

(Doc. # 1, Exh. B, § 4(c)).

Under Section 4(a) of the Agreement, however, InnerDyne makes three specific and clear warranties:

> *InnerDyne Warranty* InnerDyne warrants that the InnerDyne Devices shall conform to the Specifications in the attached Exhibit "A", *shall be free from defects in all respects* and shall adhere to the quality standards of the FDA.

(Doc. # 1, Exh. B, § 4(a) (emphasis added)).

Thus, Section 4(a) and (c), read together, warrant, among other things, that the product shall be free from defects in all respects. In addition, in Section 5(c), the Agreement states:

> *Representations* ... Maxxim and its employees and agents shall not make representations, warranties or guarantees with respect to the specifications, features or capabilities of the InnerDyne Devices that are not consistent with *InnerDyne's representations, warranties and guarantees, regulatory filing documentation or this Agreement, including InnerDyne's standard limited warranty and disclaimers.*

(Doc. # 1, Exh. B, § 5(c))(emphasis added).

Section 5(c) is impliedly an acknowledgment by InnerDyne that it made representations to Maxxim. Those representations are contained in the February Letter and they relate to the performance and benefit of the Device that Maxxim has, on information and belief, now concluded are false.

In brief, Section 4(a) of the Agreement expressly warrants against defects, and Section 5(c) clearly contemplates that InnerDyne had made certain additional warranties. As Delaware "is chary about permitting contracts to bar fraud claims," a

court will not lightly conclude that a contractual provision operates to waive a fraud in the inducement claim. *Kronenberg*, 872 A.2d at 575.

Stated summarily, for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims.

*Id.* at 593.

At this stage of the proceeding, it would be inappropriate to conclude that Maxxim could not, as a matter of law, justifiably rely on InnerDyne's representations. In other words, it cannot be concluded that Maxxim has explicitly and unambiguously promised not to rely on InnerDyne's representations.

This opinion is in full accord with the most recent Third Circuit opinion addressing anti-reliance provisions. *See MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 214–15 (3d Cir.2005) (relying on the "thoughtful" *Kronenberg* and *Progressive* decisions to provide guidance on Delaware law).

Moreover, even if the Agreement unambiguously foreclosed reliance, Maxxim would still be able to proceed on its contract law count. Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff. *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del.2003). InnerDyne asserts that Maxxim's breach of contract claim must fail for two reasons.

First, InnerDyne asserts that Maxxim has not stated a claim under the contract. But the language of Section 4(a) of the Agreement expressly warrants against defects. "A defect may take the form of a design defect, where an entire product line is designed improperly, or a manufacturing defect, where a product line is properly designed but a particular item was manufactured incorrectly." *Di Ienno v. Libbey Glass Div., Owens–Illinois, Inc.*, 668 F.Supp. 373, 377 (D.Del.1987). Under these circumstances, the essence of the complaint is that the device failed to produce the benefits touted by InnerDyne. In other words, it alleges the type of design defect referred to by the court in *Di Ienno*. As a result, Maxxim has stated a claim for breach of contract.

Second, InnerDyne asserts that Maxxim failed to satisfy a condition precedent by not raising an objection with respect to the devices within the "rejection period" mentioned in Section 4(b) of the Agreement. But Section 4(b) of the Agreement only addresses the issue of the failure of a device to meet the specifications set forth in the attached Exhibit A. Although Section 4(a) warrants that all Devices must conform to the specifications in Exhibit A, it also warrants that the Devices "shall be free from defects in all respects." The focus of the complaint is with respect to the "defects in all respects" language-not with a failure to meet specification under the attached Exhibit A. Therefore, Section 4(b) is not relevant to Maxxim's claim.

## CONCLUSION

For the reasons set forth above, the Court will deny InnerDyne's motion to dismiss.

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the defendant InnerDyne, Inc.'s motion (Doc. # 6) to dismiss the three counts of plaintiff Medical Wind Down Holdings III, Inc.'s (f/k/a Maxxim Medical, Inc.) ("Maxxim") complaint is **denied**.